(1 App. Div. 463.)

JOHNSON v. RAPALYEA et al.

(Supreme Court, Appellate Division, First Department.   February 14, 1896.)

1. ASSIGNMENT FOR BENEFIT OF CREDITORS—TAKING SECURITY PREFERENCES.
    Under Laws 1887, c. 503, providing that any preference created in a
    general assignment shall not be valid, except to the amount of one-third
    in value of the assigned estate, after making certain deductions, a lien
    taken by a creditor prior to an assignment cannot be considered a prefer-
    ence, unless the assignment was contemplated, at the time the security
    was taken, by both the debtor and creditor.

2. SAME—CREDITOR'S KNOWLEDGE OF INSOLVENCY.
    The knowledge of a creditor who takes security that his debtor is in-
    solvent, or even that he must fail, does not raise a presumption that he
    knew the debtor intended to, or would, make an assignment, so as to ren-
    der his security a preference. Ingraham, J., dissenting.

3. SAME—GENERAL RIGHTS OF PREFERRED CREDITOR.
    Under Laws 1887, c. 503, limiting preferences under a general assign-
    ment to one-third the assigned estate, creditors preferred by security, as
    to the portion of their claims remaining unpaid from such security, be-
    come general creditors, and are entitled to share in the remainder of the
    estate. Ingraham, J., dissenting.

Appeal from special term, New York county.

Action by Peter Johnson, in behalf of himself and all other judg-
ment creditors who might come in, against H. H. Rapalyea and
others.   From a judgment for plaintiff, defendants appeal.   Modified.

Argued before VAN BRUNT, P. J., and RUMSEY, PATTERSON,
O'BRIEN, and INGRAHAM, JJ.

C. E. Miller, for appellants.

Treadwell Cleveland, for respondent.

VAN BRUNT, P. J.    This action was brought by the plaintiff, as
a judgment creditor of the firm of Horace H. Rapalyea & Co., com-
posed of the defendants Horace H. Rapalyea, Frank Nickerson, and
John S. Provost, on behalf of himself and all judgment creditors,
similarly situated, who might come in and contribute to the ex-
penses of the action, to set aside an assignment made by said Rapal-
yea & Co., and certain mortgages given and judgments suffered by
them, as being fraudulent and void, and of no effect as against the
plaintiff and such other judgment creditors, and also to have the
preferences sought to be created in and by said assignment, mort-
gages, and judgments, so far as they exceeded one-third in value of
the estate sought to be assigned, declared to be invalid and of no
effect, as against the plaintiff and such other creditors as afore-
said.

.The complaint alleged the copartnership of the firm of Rapalyea
& Co.; that the defendant John C. Provost was the father of the
defendant John S. Provost; that the defendants Prince W. Nicker-
son and Charles W. Nickerson were copartners, doing business un-
der the firm name of P. W. Nickerson & Co.; and that the defendant
Prince W. Nickerson was the father, and the defendant Charles W.
Nickerson was the brother, of the defendant Frank Nickerson,
who was one of the members of the firm of Rapalyea & Co.   The
complaint further alleged the obtaining of a judgment by the plain-

tiff against the defendants composing the firm of Rapalyea & Co. on the 9th of July, 1889, the issuing of an execution, and its return unsatisfied; and, further, that on the 16th of January, 1890, the defendant Frank Nickerson made and executed, under the firm name of Rapalyea & Co., a certain chattel mortgage and bill of sale to P. W. Nickerson & Co. of a large amount of property belonging to the firm, to secure the payment of a large indebtedness of the firm of Rapalyea & Co. to the firm of P. W. Nickerson & Co., in the amount of upward of $42,000; and that said Frank Nickerson made and executed such chattel mortgage in the name of said firm of Rapalyea & Co., without the privity, consent, or authority of either of the other members of the firm.     The complaint further alleged that said mortgages and bills of sale were voluntary conveyances, and were utterly without any consideration to support the same.     The complaint further alleged that, on the 21st of January, 1890, the defendant Frank Nickerson made and executed, in the name of said firm, a certain other chattel mortgage and bill of sale to the defendant John C. Provost, the father of the defendant John S. Provost, of a large amount of property, to secure the payment of a large indebtedness of Rapalyea & Co. to Provost, in the sum of upward of $22,000, and that said mortgage and bill of sale were voluntary conveyances, and utterly without consideration to support the same.     The complaint further alleged that, on the 22d of January, 1890, said firm of Rapalyea & Co. permitted the defendant John C. Provost to obtain two judgments by default against them upon an alleged partnership liability of said firm; and that, on the 23d of January, the said firm of Rapalyea & Co., being insolvent, and unable to pay their partnership debts, duly executed an assignment for the benefit of creditors to the defendants John D. Kurtz, Crook, and Elihu B. Frost of all their property, with preferences, such assignment being expressly made subject to the lien of the chattel mortgage made by the defendants to the firm of P. W. Nickerson & Co., and also subject to the lien of the chattel mortgage made by the defendants to the defendant John C. Provost.     It further alleged that said mortgages, bills of sale, and assignment were not made in good faith, but, together with the judgments, all constituted and were to be treated as one and the same transaction and plan to hinder, delay, and defraud the plaintiff and other creditors of the firm of Rapalyea & Co.; that the value of the assigned estate attempted to be conveyed by said assignment and mortgages and bills of sale, after deducting the charges for wages and salaries, and the expenses of executing the trust of said assignment, was less than $100,000; that the amount of the preferences made and created in and by said assignment, mortgages, and bills of sale was upward of $80,000, and exceeds by many thousands of dollars the value of said assigned estate; and that said instruments and judgments and said preferences were fraudulent, illegal, and void, as against the plaintiff and the other creditors of Rapalyea & Co.     The complaint then f  her alleges that the defendant Samuel D. Coykendall claimed to be the purchaser and assignee, from the mort-

gagees therein named, of said mortgages hereinbefore referred to, and that the assignees in said assignment have been requested, on behalf of the creditors of the concern, to commence an action, as such assignees, against the owners and holders of such mortgages, bills of sale, and judgments, for the purpose of invalidating the same, and obtaining a judicial declaration that said mortgages, bills of sale, and judgments were intended to, and did, create an unlawful preference, as against the other creditors of said firm of Rapalyea & Co., and that, as such, they were fraudulent and void; but that, although thereunto duly requested, said assignees distinctly and finally refused to commence such an action, but, on the contrary, expressly stated that it was their purpose and intention to recognize said mortgages, bills of sale, and judgments as debts of said firm, and that it was their intention to pay the same out of the assets of said firm. And the complaint further alleged that, in March, 1890, the firm of P. W. Nickerson & Co. made an assignment to the defendants Caleb W. Knevals and Elihu B. Frost. The defendants answered, admitting the allegations in regard to copartnership, the execution of the various instruments stated in the complaint, and the recovery of the judgments, but denied that they were without consideration, or made with any fraudulent intent, or that the mortgages were executed and judgments obtained in contemplation of an assignment by the firm of Rapalyea & Co.

Upon the trial of this action the court held that the execution of the mortgages, the suffering of the judgments, and the execution of the assignment were all one transaction, and created invalid preferences in excess of the amount of one-third of the value of the assigned estate, and that such preferences must be reduced and scaled down to conform to the statutory limit of one-third in value of the assigned estate, after making the statutory deduction, which amount of one-third in value of the assigned estate was alone applicable to the payment of said preferences, and that an accounting be had, as in the decree provided. The court did not find that either of the instruments or judgments in question was fraudulent in fact, and therefore void. From the interlocutory judgment entered upon this decision, this appeal is taken.

It is conceded, upon the part of the respondent, that, in order to reach and scale down alleged unlawful preferences created by transactions separate and apart from the assignment, but claimed, as matter of law and fact, to constitute a part thereof, it is necessary to prove an intent on the part of the assignors to execute a general assignment, and a knowledge of that intent on the part of the creditor at the time he receives the security which is the subject of attack. The claim urged upon the part of the appellants is that there is no evidence which justified the court in finding that the execution of these mortgages, the suffering of the judgments, and the execution of the general assignment were one and the same transaction, or that, at the time the mortgagees received their securities, and the actions were commenced which resulted in the judgments, they had reason to know or believe that their debtors would shortly thereafter make an assign-

ment.   For the determination of this question, it will be necessary to consider briefly the testimony on this point.   We must first bear in mind the chronological order of events, and then consider the relations of the parties, and what was done, and what inferences must be drawn therefrom.   And it seems to me that, if the transaction is capable of two inferences, one in favor of its integrity, and the other to the contrary, the inference in favor of the position that no fraud upon the law was attempted must be the one that should prevail.   This is certainly the rule in regard to fraud in fact (Morris v. Talcott, 96 N. Y. 100), and I can see no reason why it should not prevail in respect to fraud upon the law.

The evidence showed that, from the spring of 1887 until the filing of said general assignment by said firm on January 24, 1890, the firm of Rapalyea & Co. had been doing business in the cities of New York and Long Island City.   Their capital, when the partnership was formed, consisted of $10,000 in cash and $10,000 in buildings, material, and merchandise.   This latter was transferred to the firm by John C. Provost, as the contribution of his son John S. Provost; and the $10,000 in cash was furnished by Prince W. Nickerson, as a loan to his son Frank Nickerson, and as the contribution of said Frank Nickerson to the capital of the firm of Rapalyea & Co.   The defendants Prince W. Nickerson and Charles W. Nickerson were, at the times of the various transactions mentioned, and until they executed their general assignment on the 17th of March, 1890, copartners, doing business under the firm name of P. W. Nickerson & Co.   Frank Nickerson was the financial manager of the firm of Rapalyea & Co.   John C. Provost and the firm of P. W. Nickerson & Co. were in the habit of aiding the firm of Rapalyea & Co. with loans, and for a considerable time prior to their failure the firm of Rapalyea & Co. were largely indebted to the said John C. Provost and P. W. Nickerson & Co., and without this accommodation Rapalyea & Co. would not have been able to have continued their business; certainly, not upon the scale on which it was carried on.   In fact, the defendant Prince W. Nickerson testified that he had been carrying them for three years.   On the 2d of October, 1889, the defendant John C. Provost began an action against the firm of Rapalyea & Co. for the sum of $5,375.37, upon certain checks, drafts, and notes which said John C. Provost held, and which had not been paid, by the service of a summons, with notice, upon the defendant John S. Provost.   On the 16th of December following said John C. Provost commenced another action against Rapalyea & Co. to recover judgment for the sum of $8,625, with interest from the 15th of July, 1889, upon certain promissory notes held by him which were unpaid, by the service of a summons and notice upon the defendant John S. Provost.   On the 20th of December, 1889, the defendant Rapalyea admitted due service of the summonses above mentioned, and appeared in person in the action, waiving all further service of papers upon him.   The defendants did not answer, and no judgments were entered in these actions until the 22d of January, 1890, when judgment rolls were filed in the office of the clerk of Queens county at 4 o'clock on that day.   Some time prior to the 16th

of January, 1890, the firm of P. W. Nickerson & Co. had been in the habit of having discounted at their bank, to a considerable amount, the notes of Rapalyea & Co. which they held.   At or about this time the president of the bank declined to make any further discounts unless Nickerson & Co. had some security from Rapalyea & Co. for the large amount which was owing to them;   and on said 16th day of January, Frank Nickerson, without the knowledge of his partners, executed a chattel mortgage to his father to secure the sum of $42,000, or thereabouts, which was filed in the office of the clerk of Queens county, on the following day.   This mortgage was prepared and executed at the house of Mr. Frost, who was the counsel for Nickerson & Co. and Rapalyea & Co., on the night of the 16th of January;   all the Nickersons, Mr. Frost and his son, and Nickerson's bookkeeper being present.   There was some testimony tending to show that the subject of this mortgage had been under discussion for three or four days prior to its actual execution.   At and prior to this time, negotiations had been going on for the sale of an interest in the firm of Rapalyea & Co. to the defendant John C. Provost, and a meeting was had at the office of one Andrew J. Provost, in reference to that matter, on the 20th or 21st of January, 1890, and there were present at that interview John C. Provost, John S. Provost, Frank Nickerson, one Jones, and Rapalyea. The conversation at this time was with reference to the purchase by John C. Provost of Frank Nickerson's interest, and after it had proceeded to a certain point Frank Nickerson asked them to adjourn to the office of Mr. Calvin Frost, the attorney who had drawn the mortgage.   Mr. Frank Nickerson then stated, in Frost's presence, that John C. Provost proposed buying out his interest.   Upon hearing this, Mr. Frost stated that this would be impossible under the circumstances, and then said that Frank Nickerson had given to his father and brother a chattel mortgage.   This was the first intimation that the other members of the firm of Rapalyea & Co. had of the existence of the mortgage.   Upon the discovery of this chattel mortgage, John C. Provost asked Frank Nickerson what he was going to do to protect him.   Nickerson replied that he would give him a mortgage, the same as he had his father and brother.   That mortgage was prepared about the same time, as Mr. Rapalyea thought, by Mr. Andrew J. Provost, on or about the same day.   The suggestion about the chattel mortgage to John C. Provost was made late in the interview.   The defendant Rapalyea swore that the necessity of making an assignment was not discussed at that interview;   that upon the next day they had another interview at Mr. Frost's office, when the circumstances were fully discussed, and it was finally determined that, for the protection of their creditors, it would be best for them to make an assignment. The witness further stated that he thought Mr. Frost suggested the necessity of a general assignment,—that he could see nothing better for them to do.   And the witness thought that, with that mortgage outstanding, it was absolutely necessary to make an assignment.   Upon further examination of this witness, he stated that it was possible that all the transactions, which he had spread over a period of two or three days, might have taken place within two days, the first inter-

view on one day, the second interview on the following day, and the assignment executed on that day.    Executions were issued on the morning of the 23d of January upon the Provost judgments, and the assignment of Rapalyea & Co. was executed on that day, and duly filed on the 24th of January, 1890.

From the foregoing facts it undoubtedly appears that Nickerson & Co., Rapalyea & Co., and John C. Provost knew that, if the support which the firm of Rapalyea & Co. had been receiving from Nickerson & Co. and John C. Provost was withdrawn, and the overdue claims held by Nickerson & Co. and John C. Provost should be pressed for payment, the firm was insolvent, and that it would be unable to meet its liabilities, and that this had been the condition of the firm for a long period of time.    It was the undoubted intention of Nickerson & Co. and John C. Provost, in the commencement of the suits and the obtaining of the mortgages in question, to get some security for the advances which they had been making to the firm of Rapalyea & Co.    And it was undoubtedly Provost's intention, in the commencement of the suits in October and December, not to enter judgments upon these suits until some necessity arose for his protection, and it was a great surprise to him when, on the 20th or 21st of January, he learned the fact that Nickerson & Co. had stolen a march upon him, and secured a mortgage from Frank Nickerson for $42,000 upon the assets of the firm of Rapalyea & Co. We must necessarily conclude that the firm of Nickerson & Co. were influenced by their knowledge of the condition of Rapalyea & Co. in attempting to get security for the amount of their claim against said firm, and that the mortgage was not entirely the result of an effort to please the officers of the bank which was discounting the obligations of Rapalyea & Co. for the firm of Nickerson & Co.    But it does not seem to me that Nickerson & Co., at the time of accepting this mortgage, either knew or believed that the firm of Rapalyea & Co., in a few days thereafter, would make an assignment containing preferences, or that, at the time of the giving of that mortgage, it was the intention of the firm of Rapalyea & Co., or of any one of its members, to make such an assignment, and that the necessity of such action in the immediate future was not present to the minds of the parties who participated in that transaction.    In order to invalidate the security which was received by Nickerson & Co., it is not only necessary to show insolvency upon the part of the mortgagors, but also that the mortgage was made in anticipation of the making of an assignment, and that the party receiving the mortgage knew that that was the intention of the mortgagors.    In respect to this mortgage to Nickerson & Co., it seems to me that the case is barren of evidence from which such deduction must be drawn.    I do not know that it is an inevitable conclusion that the simple fact of knowledge that a firm must fail necessitates also knowledge of the fact that such firm will make an assignment, as the court may, perhaps, take judicial notice of the fact that firms do fail, and do not make assignments.    It therefore seems to me, upon a consideration of the evidence on this ques-

tion, that no sufficient foundation was laid for the conclusion of the learned court below that the mortgage to Nickerson & Co. was part and parcel of the scheme and plan which resulted in the making of the assignment executed on the 22d of January following.

In respect to the judgments obtained by John C. Provost, there does not seem to be any ground for prohibiting a creditor from bringing an action upon a claim which is due. And I know of no penalty which he incurs by his failure to enter a judgment as soon as he is entitled to do so, nor of any penalty which any party may incur by reason of the failure to defend an action to which no defense exists. And, unless some such penalty can be imposed, it is difficult to see how these judgments, which were not entered by Provost until after he knew that Rapalyea & Co. were going to make an assignment, can be attacked. The consent of Rapalyea & Co. was not necessary to the entry of these judgments. A party has the right to avail himself of the ordinary processes of the law for securing a lien upon his debtor's property; and as the bringing of the suits was not part and parcel of the scheme and plan which resulted in the assignment, I can see no ground upon which Provost can be deprived of the lien which he has thus acquired.

In respect to the mortgage which was executed to John C. Provost, under the circumstances stated, I think that the conclusion must necessarily be drawn that it was executed at a time when all the parties knew that Rapalyea & Co. would make the assignment which was executed on the 22d of January, 1890. It appears that that mortgage to Provost was suggested when he learned of the mortgage which Nickerson & Co. had received, and that Rapalyea & Co. seemed to have at once discussed the question of making an assignment. It is true that Mr. Rapalyea states it to have been the next day, but it seems to me that the fair inference to be drawn is that that question was discussed at the interview had upon the day upon which it was decided to make an assignment. Provost was familiar with all that was going on, and undoubtedly knew that the assignment was to follow. This being the condition of affairs, he would seem to be within the rule that a party taking security from a debtor, knowing that this debtor is about to assign, can only hold such security to an amount which will bring the preferences within one-third of the assigned estate after the statutory deductions.

It follows, therefore, that the judgment must be modified, dismissing the complaint as to P. W. Nickerson & Co., and holding valid the judgments obtained by John S. Provost, and scaling down the mortgage to John C. Provost and the preferences contained in the assignment; and the provision prohibiting the preferred creditors from participating in any part of the assigned estate must also be modified, as such preferred creditors become general creditors in respect to that portion of their claims for which they had not received payment.

Judgment ordered accordingly, without costs to either party.

RUMSEY, PATTERSON, and O'BRIEN, JJ., concur.

INGRAHAM, J. (dissenting). It is a little difficult, from an examination of the complaint, to determine upon just what theory this action was brought. It would seem that it was framed with the idea of including alternative forms of relief; and when we consider the conflict that there had been between the several courts at the time this complaint was drawn, and the uncertainty as to just what rules would govern where relief was asked because of a violation of Act 1887, c. 503, it is clear that the pleader had in view this uncertainty, and intended to state the facts, and then to ask for such relief as the facts alleged would warrant. From the demand for judgment, it would appear that the relief to which the plaintiff supposes himself to be entitled was that the assignment itself, and the judgments and chattel mortgages described in the complaint, should be set aside as fraudulent and void, as against the plaintiff and other creditors. Such an action would be based upon fraud, and the usual rules applying to actions for fraud, both as to the admission of evidence and the nature of the proof necessary to sustain such causes of action, would have to be observed. Before the case came on for trial, however, it had been finally settled by the court of appeals that the proper remedy in such a case was, not that the assignment and other instruments by which a violation of the provisions of the act in question was attempted should be set aside, but that the court could give effect to that act by treating the instruments complained of as a part of the assignment, and as an attempt to create a preference prohibited by the act referred to, and scale down such preference to an amount allowed by the statute. The case was tried upon that theory, and judgment was awarded granting the plaintiff such relief.

The complaint clearly alleges facts sufficient to sustain an action of this character, and the only question that we have to determine is whether or not, upon the evidence in the case, and the facts found by the court below, the judgment was authorized. In the opinion of the Presiding Justice, he seems to assume that this is an action based upon a fraud upon the law, and applies the rule that, if a transaction is capable of two inferences, one in favor of its integrity and the other to the contrary, the inference that no fraud was attempted is the one that must prevail; but I do not think this action is one based upon fraud. The act in question, which is claimed to have been violated by the defendants, is an amendment to the act in relation to the assignment of the estate of debtors for the benefit of creditors. By this act, section 30 of the assignment act is amended so as to provide that, "in all general assignments of the estates of debtors for the benefit of creditors hereafter made, any preference created therein * * * shall not be valid except to the amount of one-third in value of the assigned estate left after deducting" certain wages or salaries of employés, and the costs and expenses of executing such trust. The court below found that two chattel mortgages, two bills of sale, and two judgments in favor of various defendants were and are a part of the same transaction with the general assignment for the benefit of the creditors of the firm of H. H. Rapalyea & Co., and that such chattel mortgages and bills of sale and judgments were invalid preferences

in excess of the amount of one-third in value of the assigned estate, and directed judgment by which that preference was reduced and scaled down to conform to such statutory limits, of one-third in value of the assigned estate left after making the statutory deductions as aforesaid; and an accounting was ordered before a referee to determine the amount of the estate of the defendants' assignees,—the final judgment to be reserved until the coming in of the referee's report.

Is an action to obtain such a judgment an action based upon fraud, or to which the rules before stated as applicable to actions to obtain relief because of fraud are applicable? In a case where the preferences in excess of that allowed by the act in question were contained in the general assignment itself, and the question was whether or not such preferences should be paid in full, or should be limited to the one-third of the assigned estate, the sole question to be determined would be the amount of the assigned estate, and whether or not the debts preferred exceeded one-third of that amount after making the proper deductions. No fraud needed to be alleged or proved to entitle an assignee, or a creditor seeking to enforce the provisions of the statute, to maintain such an action. Whether or not the assignor and the creditor fraudulently created the preference, or innocently created it under a mistake of fact, would not be at all material. What the court would be bound to do would be to prevent either the assignor from paying, or the creditor from receiving, from the assigned estate a greater amount of such estate than the law allowed; and that would be so without considering the intent with which the preference was created. In a case in which a debtor and a preferred creditor had evaded the statute by using separate instruments to create the preference, where both such instruments and the general assignment were to be treated as one instrument, I can see no reason why a different rule should prevail. The acts and intentions of the assignor and the preferred creditor might then be material, in order to determine whether or not the instruments used to create the preference were to be considered a part of the general assignment, so that the preference created would be considered to be a preference created by the general assignment, and thus within the prohibition of the statute. But, even then, the question of the fraudulent intent would be immaterial, and the liability of the defendants would be the same, whether or not they knew of the statute, and intended to violate it. The right of a creditor to ask the interference of the court would depend upon whether or not the assignor and the preferred creditor did, by means of these two instruments, which bore such relation to each other that they must be deemed to be but one instrument, attain a preference greater than that allowed by the statute.

In determining this question, therefore, it seems to me that it should be viewed simply as one from which the court is to determine—First, whether these mortgages, bills of sale, and judgments were executed before, but in contemplation of, the execution of the general assignment; and, second, whether, if so, the preference thereby created exceeded one-third of the assigned estate. Both of those propositions being found, it becomes the duty of the assignee, and of the court, in

an action by him or in his behalf, in aid of the assignment for the benefit of creditors, to provide that the preferred creditors should be paid not more than one-third of the assigned estate. Berger v. Varrelmann, 127 N. Y. 281, 27 N. E. 1065; Spelman v. Freedman, 130 N. Y. 421, 29 N. E. 765. In Maass v. Falk, 146 N. Y. 39, 40 N. E. 504, Gray, J., in delivering the opinion of the court, says:

"The prohibition of the act of 1887 against the creation of preferences, except to the amount of one-third in value of the assigned estate, cannot be evaded by resort to instrumentalities which, however independent, are merely part of a plan through which certain creditors secure a preference in payment, and the distribution of the debtor's assets as intended by the statute is prevented. Such a scheme between a debtor and some of his creditors would be as intolerable an evasion of the statute as would be a transaction where the particular instrumentality resorted to between the parties to secure the undue preference was a transfer of property, made independently, but in contemplation of a general assignment."

It seems to me that a proper consideration of what was decided in each of these cases makes reasonably clear the rules which should govern in disposing of attempted violations of this act of 1887; that is, that where a debtor is insolvent, and intends to apply all of his property to the payment of his debts, either by a general assignment, or by instruments which, taken together, are parts of a plan through which all the debtor's assets are distributed among his creditors, but one-third of the assets can be devoted to the preferred creditors, and the remaining two-thirds must be distributed among the general creditors of the estate, the purpose of the statute is to prevent any preference, other than for wages or salaries of employés, beyond one-third of the assigned estate, and if that amount is exceeded, the penalty is, not the annihilation of the assignment, but the reduction of the preference to the prescribed limit. Manning v. Beck, 129 N. Y. 1, 29 N. E. 90.

We have, then, the question to determine, is there evidence here to sustain the finding that these assignors executed these mortgages and bills of sale, and allowed these judgments, and executed the general assignment, as a part of a plan or scheme by which all of their assets were to be devoted to the payment of their debts, but giving to the favored few a preference in excess of that allowed by statute? The court below has found that such was the intention of the assignors and of the favored creditors. Was there evidence to support that finding? In determining this question, I know of no principle which requires us to hold that any particular method of proof is necessary. When we come to inquire as to the intent with which the act is done, or as to the knowledge of the persons concerned in an act, it is not required that we should have evidence of any particular communication made to or by the parties whose intent or knowledge we are inquiring about. The court must judge of such knowledge or intent from the acts of the parties themselves, from the circumstances surrounding the transaction in which they were engaged, from the object sought to be accomplished; and, looking at all the testimony, the question is whether there is a fair inference, from the facts, that such intent existed, or

that such knowledge was present. Nor do I think that a case is presented like that where a fraudulent act has to be proved, and where the court is bound to presume innocence where the evidence is capable of two constructions. What is here to be determined is whether this evidence fairly justified the finding of the court; and, if it did, that finding should not be disturbed.

As I understand the rule settled by the authorities referred to, to justify the court, in finding that the separate instruments are part of the general assignment it must be shown by the evidence that they were made with the intent of both parties to the agreement that they should be used to secure to the creditor an excessive preference when a general assignment was made. There must be proved such facts as would justify the inference that it was contemplated by both the debtor and the creditor that a general assignment would be necessary and would be made; that the security given or the judgment obtained would be used, not as a mere giving of security to enable a creditor to obtain his money from his debtor, but to obtain a preference when such assignment was made. Now, it is obvious that in nearly all cases there can be no direct proof of what the debtor and creditor had in mind when the instrument giving the security was executed. The knowledge existing at the time, and the intent with which the security was made and accepted, must, in the great majority of cases, be proved by the circumstances existing at the time of the transaction, and the acts and relations of the parties to it. Nor does it follow that, when the security is either given by a firm or to a firm, all members of the firm must be shown to have had the knowledge and intent referred to. If one partner, representing the debtor firm, executes the instrument, and another partner, representing the creditor firm, receives it, with such knowledge and intent, that is, of course, sufficient to charge both firms. Bearing this in mind, a short examination of the condition of affairs and the circumstances surrounding the giving of these chattel mortgages and bills of sale and the obtaining of these judgments, with the use that the creditors made of them after they were obtained, entirely justified, I think, the finding of the court below.

As the Nickerson mortgage was first in point of time, it will be well to consider that mortgage first. And, first, let us see just what knowledge of the condition of this debtor firm Nickerson had at this time. It is clear that the real condition of Rapalyea & Co., the amount of its capital, and the business that it was doing were well known to the Nickersons. Of the members of the firm of Nickerson & Co., one was the father and the other the brother of a member of the firm of Rapalyea & Co. The father had contributed to the firm of Rapalyea & Co. all of the cash that went into that firm, as the contribution of his son to the capital stock of Rapalyea & Co. He had been in the habit of making advances to the firm, and had known, for months past, that its notes had been protested for nonpayment, that its checks had been returned from the bank as not good, and that it had been in urgent need of money. P. W.

Nickerson, the father, had been present, on or about the 1st of January, when a statement of the firm's condition had been prepared, and had taken part in making up that statement; and the fair inference from the evidence is that P. W. Nickerson was fully cognizant of these financial difficulties of the firm of Rapalyea & Co., must have known its exact condition, and was in constant communication with his son, who was a member of that firm, and who transacted the financial business of the firm, in regard to its affairs. And, viewed in the light of subsequent events, it quite conclusively appears that, on the 1st day of January, Rapalyea & Co., if they had been forced into liquidation, would have been insolvent. Prior to this time it appears that the son, who was a member of the firm of Rapalyea & Co., had been endeavoring to sell out his interest in the firm to Mr. John C. Provost, who was the father of another member of the firm of Rapalyea & Co., and negotiations for such sale were then pending. Nickerson & Co. had at that time a large number of past-due notes of Rapalyea & Co., which the latter were unable to pay, and was a creditor of the firm in a considerable amount. P. W. Nickerson had been advised by the cashier of his bank to obtain security from Rapalyea & Co., and about the 16th of January he asked his son for such security. The son made no objection to giving the security asked for, and then it was that the Nickersons, the father and two sons, met together, in the evening, at the house of Mr. Frost, who was the attorney of Nickerson & Co., and the chattel mortgage in question was prepared. No time was lost; no risk run. It was written out that night, a part of it by Mr. Frost and parts by the others present; was executed by Nickerson, as a member of the firm of Rapalyea & Co., that night; and was acknowledged before Mr. Frost's son, who was subsequently one of the assignees. The main part of the debt secured by this chattel mortgage was due and owing at the time, and as to such debt the mortgage was payable upon demand.

The question is, what was the intent and understanding between this father and son at the time this mortgage was given? The action of the parties to it, subsequently, is quite material. The mortgage was taken the next day, and filed in the proper office in Queens county, where the property was situated; but all knowledge of it was withheld from the other members of the firm of Rapalyea & Co., and, although the mortgage was presently due, no attempt was made to enforce it, or to collect any of the obligations to secure which it was given, some of which had been for several months due. No disclosure was made to any one of the fact that this mortgage was given. It was a secret agreement between father and son to secure the father at all hazards for a debt that was presently due and enforceable, studiously kept from the knowledge of the other members of the firm of Rapalyea & Co., and all other persons interested, while the negotiations to sell the son's interest in the business to Provost continued. What was the object of obtaining this security, and what was the intent with which it was given by the debtor and accepted by the creditor? Mr. Haviland, an apparently disinterested witness, testified

that, just after the failure, he met P. W. Nickerson, and spoke of the failure of Rapalyea & Co., and P. W. Nickerson said:

"Yes; it was too bad the boys had to go under. They had a good business there; but, when I found they had to go under, I told them they must protect me."

Do not all of the acts of the parties show that this was true? I think we are entitled to assume that P. W. Nickerson & Co. had knowledge of the system, established in this state, by which debtors who are engaged in business, and who have become insolvent, make assignments for the benefit of creditors, and that such assignments are the only method here of preventing the property of a firm from being appropriated to the first creditors who might get judgment against the firm; that assignments are the common and almost universal method by which insolvent firms wind up their business, and are carefully regulated by statute. And, viewing the facts thus collated, can there be any serious doubt but that both parties to this mortgage clearly recognized the fact that, unless help came in some unexpected way, an assignment would be necessary, and that this mortgage and bill of sale were given for the purpose of use in the event of such assignment being executed, to prefer the father and brother over the other creditors of the firm? Upon no other theory can we explain the silence of all parties in regard to this instrument. The studious care to conceal its existence from the other members of the firm of Rapalyea & Co., and the continued negotiations for the selling out of Nickerson's interest in the firm to Provost, and the fact that Nickerson continued to advance small sums of money to the debtors after this security was given, to enable them to keep going until it could be ascertained whether or not Provost would buy, are corroborative of the inference that this was the intent and understanding with which this instrument was given. But for the statute above named, and of which Nickerson swears he had no knowledge, this chattel mortgage would have given Nickerson & Co. a preference that would have enabled them to realize upon their debt notwithstanding the assignment, and made them independent of the assignee.

We are also entitled, I think, to consider the effect upon this firm of the giving of this mortgage. The moment it was known to the other members of the firm, it was at once conceded by them all, as well as by Mr. Frost, Nickerson's attorney, that there could be but one thing done, and that was at once to make an assignment. It was recognized by them all that it would be impossible for the firm to continue business with that chattel mortgage in existence, as soon as the fact of its existence was known; and, although Mr. Frank Nickerson, who had executed that chattel mortgage, was present at the time, he did not dissent at all from that conclusion. Can any other inference than the one above indicated be drawn from these circumstances? Both the debtor and creditors swore that no reference was made to an assignment. Assuming that to be true, I do not think it is controlling. The parties might both have well understood what would be necessary, unless relief were forthcoming, without expressly using the word "assignment." But the inference seems plain that this

mortgage was given and received with the clear intention of using it, when it became necessary for the debtors to assign, as a means of preferring the creditor's claim.　And the mere fact that the assignment was made six or seven days later does not preclude the existence of the intention, at the time it was given, that it should be used, in connection with an assignment subsequently to be made, for the purpose of preferring the creditor.　It may be that, but for Mr. Frost's integrity, Nickerson would have got the $10,000 from Mr. Provost for his interest in the firm without disclosing the existence of the chattel mortgage, and thus the Nickersons would not only have got back the money that they had advanced, but the money that they had contributed to the capital of this insolvent firm, leaving the other members of the firm and Mr. Provost to suffer when the crash came.　The scheme seems to me to be perfectly apparent upon its face, and was not a mere honest attempt of a creditor to obtain security for the repayment of his debt, but was clearly one for obtaining a preference for this creditor in case Provost should refuse to buy, and an assignment became necessary.

The remaining question to be determined is as to whether or not the judgment and chattel mortgage and bill of sale obtained by Provost were obtained with a like intent and understanding.　It seems to me clear that they were.　It appears that, on the 2d of October, Provost, who also had a son a member of this firm of Rapalyea & Co., caused a summons to be served upon his son as a member of that firm. No complaint was served with the summons, and, after its service, it was allowed to sleep without the slightest effort being made to enter judgment, or to enforce it, for months.　The notice at the foot of the summons was that judgment would be entered against the defendant for the sum of $5,375.37, with interest from the date of the summons; but that is the only evidence we have as to what claim it was intended to enforce by the action thus commenced.　No complaint was prepared.　Nothing was done.　Upon the affidavit of service was indorsed an admission of service by the defendant Rapalyea, who appeared in person in the action, and waived the service of all further papers therein, dated on December 20, 1889.　Another summons by John C. Provost against the same firm, dated December 16, 1889, contained the same admission of service by Horace H. Rapalyea, as defendant, in person, with the same waiver, and dated the same day. With that summons there is no affidavit of service.　On the 22d of January, 1890, the complaint in these two actions was verified, and it was on this day that the interview took place at which the existence of this chattel mortgage to Nickerson was revealed, and from which time it seems to have been conceded by all that this firm could not continue business.　The judgment roll in these two actions was filed in the clerk's office of Queens county on January 22, 1890, at 4 o'clock in the afternoon, and on the next morning the defendant Rapalyea, one of the judgment debtors against whom this judgment was obtained, took the execution upon these two judgments to the sheriff of Queens county, giving the sheriff explicit directions upon what to levy, and that the levy should be made at once.　The sheriff made

such levy, and immediately afterwards, and upon the same day, the assignment was executed, and was filed the following day.   It is conceded that Provost had the right to commence this action against the defendants, and to enter judgment against the defendants for the amount that was due;   and, but for the levy that was obtained upon the execution issued under it, no question could arise.   It is settled that, where a judgment and a levy under an execution upon it are used as instrumentalities by which a preference is to be obtained, in violation of the statute, it will be treated as a part of the assignment, and as though the preference that was obtained was included in the assignment itself.   Berger v. Varrelmann, 127 N. Y. 284, 27 N. E. 1065; Bank v. Seligman, 138 N. Y. 444, 34 N. E. 196.   After the service of the summons in these two actions, nothing was done.   No attempt was made to enter the judgment.   The complaints were not even prepared until after the disclosure of the existence of this chattel mortgage, when it is perfectly clear that all parties understood that the firm must make an assignment.   The judgments were then prepared, and the judgment roll at once filed.   One of the debtors himself took the execution to the sheriff, with directions as to its levy, so that the lien could be obtained upon the property of the debtors immediately before the assignment should be filed, and the assignment was kept off the file until such levy could be made;   for, although the assignment was executed on January 23d, it was not filed until 4 p. m. of the 24th.   There can be no doubt that this levy was made under this execution with the intent and for the purpose of getting a lien upon the debtors' property that would give the judgment creditor a preference, and, under the authority of the cases above cited, it must be held to be a preference given under the assignment.

As to the chattel mortgage and bills of sale given to Provost, which were dated the 21st of January, 1890, it is conceded by the parties that they were given after the disclosure of the fact of the chattel mortgage to Nickerson, and then it was clear that an assignment would have to be made;   and it is clear that it was given for the purpose of allowing Provost to obtain a preference.   It seems to me, therefore, that, unless we are to abrogate the provisions of this statute, and destroy the purpose for which it was passed, we must hold these chattel mortgages, bills of sale, and judgments as preferences within the assignment, and that the court was right in decreeing that but one-third of the debtors' estate can be paid to the creditors who have thus directly obtained a preference.   I think the provision of the judgment by which these preferred creditors have no right to claim any portion of the remaining two-thirds of the estate on account of their claims was clearly right.   The statute directly provides that but one-third of the assigned estate shall be paid to the preferred creditors, and it necessarily follows that the remaining two-thirds of the estate are to be paid to the unsecured creditors.   To allow the preferred creditors to receive one-third of the estate upon their demands, and then to have a portion of the remaining two-thirds applied to the payment of their claim, would enable them to receive more than one-third of the assigned estate.   The provision of the judgment, however,

that requires creditors coming in to prove their debts before the referee should contribute to the expenses of this action, is entirely unauthorized.    The general creditors of the assignors are entitled to have two-thirds of the assigned estate devoted to the payment of their claims against the assignors, and the court has no power to compel them to pay the plaintiff's counsel fees in this action before they can be entitled to share in the debtors' property.    The question of costs of the action is reserved until the final judgment, and it would there be proper for the court, in its discretion, to require the defendants to pay the costs of the action, or to order the costs to be paid out of the assigned estate.    As this action was brought for the benefit of all the creditors, and as the judgment will result in the addition of considerable property to be applied to the payment of the general creditors, it would not be beyond the power of the court below, either in the final judgment, or in an independent proceeding, to order the expenses of this action paid by the assignee out of the assigned estate.    But it would be manifestly improper to compel each creditor, before he asks for what is legally his own, to pay a sum of money to the plaintiff. Just what disposition the court will ultimately make as to the costs of the action, or as to the expenses, must rest in the discretion of the court, upon the final judgment, or upon an application for such costs.

I think, therefore, that the judgment should be modified by striking out all provisions limiting the right of the creditors to prove their claims before the referee to those who had contributed to the costs and expenses of this action, and also the clause that compels them to pay any portion of such costs and expenses before they are allowed to receive any portion of the assigned estate, and, as so modified, the judgment should be affirmed, with costs to the respondent against the appellants.